FRANK M. and MABLE F. NORRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Norris v. Commissioner
Docket No. 1144-71.
United States Tax Court
T.C. Memo 1976-42; 1976 Tax Ct. Memo LEXIS 361; 35 T.C.M. (CCH) 182; T.C.M. (RIA) 760042; February 19, 1976, Filed Frank M. Norris, pro se. [1]
Richard D. Hall, Jr. and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief *362 Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husbandpetitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' 1969 Federal income taxes in the amount of $228.59. The issue is whether all or any portion of per diem payments received by petitioner Frank Norris (hereinafter, "petitioner") from Dynalectron Corporation (hereinafter, "Dynalectron") should be included *363 in his gross income for 1969 under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount as away-from-home traveling expenses under section 162(a)(2) FINDINGS OF FACT Petitioners, husband and wife, filed their 1969 return with the Internal Revenue Service Center at Chamblee, Georgia. The record does not establish the location of petitioners' residence at the time they filed their petition in this case.
During 1969, petitioner was employed as a member of two different field teams by Dynalectron. That corporation, as well as Lockheed Air Service Company (hereinafter, "Lockheed"), had a contract with the United States Air Force during 1969, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here *364 were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 *365 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder.
* * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid.
The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely *366 within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract.However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week *367 or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract.It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained *368 any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. *369 During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, *370 irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed.There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was first hired by Dynalectron *371 in 1956. On February 1, 1966, he was assigned to Mather Air Force Base in California. Thereafter on January 12, 1967, he was assigned to Amarillo, Texas. About seven months later, on August 10, 1967, Dynalectron assigned petitioner to Spokane, Washington, where he stayed until August 21, 1969, when he was transferred to Key Field at Meridian, Mississippi.Petitioner remained at Meridian for the remainder of 1969 and until December 2, 1970, when his service with Dynalectron was terminated. Dynalectron did not advise petitioner as to the length of time he would remain at either Spokane or Meridian when he was assigned to those posts of duty.
Petitioner advised Dynalectron that 302 West 7th Street, Trenton, Missouri, was his actual residence. That is the rented premises occupied by petitioner's mother. Petitioner was born and raised in Trenton, and besides his mother he has a brother who owns and lives in a home there. Some of petitioner's mail is sent to the West 7th Street address and is forwarded to him by his mother. Neither petitioner nor his wife owns any real property in Trenton. Petitioner's wife accompanied him at both of his 1969 assignments. Petitioner explained *372 this practice in the following words: "I could not afford to keep up two places and also my wife had been sick and the doctor said she should be with me." Petitioner received per diem payments of $2,178 while on his Spokane assignment in 1969, and such payments in the amount of $1,044 while at Meridian. He did not include any amount of per diem in gross income on his 1969 return. In respondent's statutory notice of deficiency, he determined that $1,125 of per diem payments should have been included in petitioner's 1969 gross income. On brief, respondent stated that none of the per diem received by petitioner in respect of his 1969 Spokane assignment had been included in his income. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969, in respect of his assignment to Meridian are includible in his gross income for that year. It is believed that the Meridian-related per diem payments when received by petitioner constituted gross income. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" *373 to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's income the per diem payments received at Meridian in 1969. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4] The amount of such payments was, however, $1,044, and not $1,125 as determined by respondent. The question remains whether petitioner is entitled to deduct any part or all of the per diem payments under section 162(a)(2) as expenses for travel while away from home in pursuit of his trade or business as an employer of Dynalectron. Leo C. Cockrell, supra, p. 479. *374 In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expense must be (1) reasonable and necessary traveling expense, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment *375 goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points are thus presented: Was petitioner's assignment to Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? Presumably respondent concedes that petitioner's 1969 assignment to Spokane was temporary since he did not include the per diem payments with respect to such assignment in petitioner's gross income for 1969. Respondent does contend that the 1969 Meridian assignment was indefinite. However, bearing in mind the contractual arrangements between Dynalectron and the Air Force, the employment arrangements between petitioner and Dynalectron, and petitioner's employment history with *376 that company -- all having been described in the findings of fact -- it is believed that the 1969 Meridian assignment should likewise be characterized as a temporary one. Respondent urges, correctly, that an assignment temporary in its inception may, with the passage of time, be transformed into an indefinite one. It is not believed that, by the end of 1969, the point in time for such a transformation had been reached insofar as petitioner's assignment to Meridian is concerned. On the second point, the evidence is not persuasive that petitioner maintained two places of abode and thereby incurred those additional and duplicate living expenses, the burden of which the deduction afforded by section 162(a)(2) is designed to mitigate. Mrs. Norris accompanied petitioner to Meridian, and it was in that city that they worked, ate, slept -- in short, made their home and incurred family living expenses. Petitioner incurred no such expenses at Trenton, Missouri, or any other locality during his Meridian assignment. His tenuous ties to Trenton are just not substantial in nature so as to qualify that city as petitioner's home for tax purposes during the time of his Meridian assignment. To *377 sum up, petitioner was at, not away from, his home, for the purposes of section 162(a)(2), during his 1969 Meridian assignment. No doubt at some earlier point Trenton could have qualified as petitioner's tax home, but by 1969, and probably long before that year, it had been abandoned and could not qualify as such.Accordingly, petitioner should not be entitled to any deduction for away-from-home travel expenses under section 162(a)(2) for 1969. As mentioned above, he should be chargeable with only $1,044 of per diem payments, and not $1,125 as determined by respondent. * * *
In accordance with the foregoing, Decision will be entered for respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.